Matter of Daesang Corp. v NutraSweet Co. (2018 NY Slip Op 06331)





Matter of Daesang Corp. v NutraSweet Co.


2018 NY Slip Op 06331


Decided on September 27, 2018


Appellate Division, First Department


Friedman, J.P., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on September 27, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

David Friedman,J.P.
Richard T. Andrias
Anil C. Singh
Peter H. Moulton, JJ.


655019/16 5973 

[*1]In re Daesang Corporation, Petitioner-Appellant,
v
The NutraSweet Company, et al., Respondents-Respondents. The Association of the Bar of the City of New York, Amicus Curiae.



Petitioner appeals from an order of the Supreme Court, New York County (Charles E. Ramos, J.), entered May 15, 2017, which, to the extent appealed from as limited by the briefs, held in abeyance the petition to confirm a final arbitration award, dated June 14, 2016, rendered in favor of petitioner by a tribunal of the International Chamber of Commerce, and granted respondents' cross motion to vacate the aforementioned final award and the preceding final partial award, dated December 21, 2012, rendered by the same tribunal, to the extent of vacating the awards' dismissal of respondents' second, third and fourth defenses and counterclaims and remanding those defenses and counterclaims to the tribunal for redetermination.



Morvillo Abramowitz Grand Iason & Anello P.C., New York (Edward M. Spiro, Jonathan S. Sack and Miriam L. Glaser of counsel), and Law Offices of Richard B. Pacella, New York (Richard B. Pacella of counsel), for appellant.
Tannenbaum Helpern Syracuse & Hirschtritt LLP, New York (Paul D. Sarkozi of counsel), for respondents.
Baker & McKenzie, LLP, New York (Grant Hanessian and Derek A. Soller of counsel), for amicus curiae.



FRIEDMAN, J.P.


This appeal, arising from a bitter international commercial dispute between producers of [*2]an artificial sweetener, raises the question of whether, under the Federal Arbitration Act (9 USC § 1 et seq.) (FAA), grounds exist to deny confirmation to an arbitration award rendered in New York. In the order under review, Supreme Court vacated the award in substantial part and remanded to the arbitrators, for their redetermination, certain defenses and counterclaims that they had dismissed. The court took this action, albeit "reluctant[ly]" (as it told the parties at oral argument), based on its view that the arbitrators, in disposing of these defenses and counterclaims, had manifestly disregarded the law and had misconstrued the procedural record. This was error.
The order vacating the award in part cannot be justified under the "emphatic federal policy in favor of arbitral dispute resolution" embodied in the FAA, a policy that "applies with special force in the field of international commerce" (Mitsubishi Motors Corp. v Soler Chrysler-Plymouth, 473 US 614, 631 [1985])[FN1]. Under the FAA, even if an arbitral tribunal's legal and procedural rulings might reasonably be criticized on the merits, an award is not subject to vacatur for ordinary errors of the kind the court identified in this case, as opposed to manifest disregard of the law, a concept that, as more fully discussed below, means "more than a simple error in law" (Wien & Malkin LLP v Helmsley-Spear, Inc., 6 NY3d 471, 481 [2006] [internal quotation marks omitted]). "The potential for . . . mistakes [by the arbitrators] is the price for agreeing to arbitration" (Oxford Health Plans LLC v Sutter, 569 US 564, 572-573 [2013]), and, "however disappointing [an award] may be," parties that have bargained for arbitration "must abide by it" (Wilkins v Allen, 169 NY 494, 497 [1902]; see also Matter of Pine St. Realty Co., Inc. v Coutroulos, 233 App Div 404, 407 [1st Dept 1931], lv denied 258 NY 609 [1932] ["Errors, mistakes, departures from strict legal rules, are all included in the arbitration risk"]). Accordingly, we reverse, grant the petition to confirm the award, and deny the cross motion to vacate it.
In 2002, petitioner Daesang Corporation and respondent The NutraSweet Company, the [*3]world's largest producer of the artificial sweetener aspartame, began to discuss NutraSweet's potential acquisition of Daesang's aspartame business [FN2]. In connection with these discussions, Daesang and NutraSweet entered into a December 2002 Joint Defense and Confidentiality Agreement (JDA). Section 10 of the JDA provides, inter alia, that NutraSweet is entitled to rescind any transaction ultimately agreed upon in the event legal proceedings challenging the deal as an antitrust violation are instituted "by any customer with annual worldwide aspartame requirements in excess of 1,000,000 pounds[.]"
On April 30, 2003, Daesang and NutraSweet entered into an Asset Purchase Agreement (APA), pursuant to which Daesang sold all of its aspartame assets to NutraSweet for $79,250,000, $5 million of which was to be paid at closing and the remainder in five annual installment payments. In connection with the APA, the parties also entered into a Processing Agreement, dated May 13, 2003, pursuant to which NutraSweet engaged Daesang to provide aspartame production services at the Korean manufacturing facilities that NutraSweet was acquiring. The APA and the Processing Agreement each provides that it is governed by New York law and that disputes are to be resolved through arbitration by a three-member tribunal in New York under the rules of the International Chamber of Commerce. In this regard, the APA provides that "the resolution of disputes by the arbitrators . . . shall be conclusive and binding upon and non-appealable by the Parties."
The APA and the Processing Agreement contain a number of representations and warranties by Daesang that are relevant to this appeal. Among these is Daesang's representation in the APA that it "has complied in all material respects with all applicable laws" in operating its aspartame business (the compliance-with-law warranty). Also pertinent are Daesang's representations and warranties in the APA and the Processing Agreement concerning its product quality, manufacturing processes, production capacity, and production costs, and concerning the absence of customer complaints. However, another provision of the APA bars either party from seeking rescission based solely on the other party's breach of its representations and warranties in the APA or the Processing Agreement.
After the transaction closed in May 2003, NutraSweet made the 2004 and 2005 annual installment payments of the purchase price under the APA, each in the amount of $5 million [FN3]. NutraSweet failed, however, to remit the third installment payment of $9.25 million, which became due in June 2006. In December 2006, after the requisite period of time had passed without cure of the default, Daesang exercised its right under the APA to accelerate the $55 million balance of the purchase price. In March 2007, Daesang notified NutraSweet that, pursuant to Daesang's rights under the APA in the event of a default, Daesang would resume manufacturing aspartame for its own account at the Korean plant NutraSweet had purchased. Five days later, NutraSweet notified Daesang that it was rescinding the transaction pursuant to section 10 of the JDA, based on an antitrust class action that several industrial aspartame [*4]customers had commenced against NutraSweet and Daesang (among other aspartame producers) in June 2006 (In re Aspartame Antitrust Litig., US Dist Ct, ED Pa, Master Docket No. 2:06-CV-1732).
In June 2008, Daesang, pursuant to the arbitration provisions of the APA and the Processing Agreement, commenced an arbitration proceeding against NutraSweet, seeking about $80 million in damages, plus interest, for breach of those agreements. NutraSweet filed its answer, defenses and counterclaims in August 2008. As clarified by the prehearing memorandum it submitted to the arbitrators in July 2010, NutraSweet asserted four defenses and counterclaims against Daesang:
(1) First, NutraSweet asserted that it had validly rescinded the entire transaction pursuant to section 10 of the JDA, based on the Aspartame Antitrust action, which was brought on behalf of a class comprising all industrial aspartame customers worldwide — although it is undisputed that the annual requirements of the named plaintiffs in that proceeding, even in aggregate, did not meet the million-pound level required to trigger the contractual right of rescission.
(2) Second, NutraSweet asserted that, independent of the JDA's rescission provision, it was entitled to "equitable rescission" of the transaction on the ground that Daesang's compliance-with-law warranty in the APA had been false when made and had fraudulently induced NutraSweet to enter into the deal.[FN4]
(3) Third, NutraSweet asserted it was entitled to equitable rescission based on the alleged falsity of Daesang's representations and warranties in the APA and Processing Agreement concerning its product quality, manufacturing processes, production capacity, and production costs, and concerning the absence of complaints from customers.
(4) Fourth, NutraSweet alleged that Daesang had "continuously breached its obligations under the [APA and the Processing Agreement]" by "fail[ing] to maintain the plant, fail[ing] to manufacture aspartame according to the agreed-upon specifications, and fail[ing] to supply NutraSweet with sufficient quantities of saleable aspartame."
In support of their claims and defenses, the parties submitted, in addition to their pleadings and legal memoranda, written declarations by 20 witnesses and hundreds of evidentiary exhibits. In July 2011, a nine-day evidentiary hearing was held in New York before the tribunal of three arbitrators, at which 11 witnesses were cross-examined. At the end of the hearing, the tribunal directed the parties to make additional submissions, including documents outlining the parties' respective claims and defenses, with citations of supporting evidence and legal authority.
Pursuant to the tribunal's direction, NutraSweet submitted a 76-page document entitled "NutraSweet's Post-Hearing Summaries" (hereinafter, the NS Post-Hearing Summaries), which, among other things, set forth, in outline form, NutraSweet's aforementioned four defenses and counterclaims — the first for rescission under the JDA, the second and third for rescission based on fraudulent inducement, and the fourth for breach of contract. Attached to the NS Post-Hearing Summaries was a three-page exhibit marked for identification as "NS 230 — Updated," and entitled "Summary of NutraSweet's Counterclaim Damages Based on JDA and Equitable Rescission Alternatives" (hereinafter, NS 230), which sets forth separate tabular calculations of damages based, respectively, on rescission pursuant to the JDA (the first counterclaim) and "equitable rescission" (the second and third counterclaims)[FN5]. Perhaps fatefully for the outcome of the arbitration, NS 230 does not identify either set of damages calculations as relating to NutraSweet's fourth counterclaim, for breach of contract. Nevertheless, the summary of the breach-of-contract counterclaim in the NS Post-Hearing Summaries asserts that the arbitrators "should enter an award [on that claim] in favor of NutraSweet in the amount [including interest through August 1, 2011] of $13,857,782.33" — the same amount sought in connection with the counterclaim for rescission based on the JDA.[FN6]
After a full day of oral closing argument was heard in New York on October 20, 2011, the tribunal issued a 34-page "Partial Final Award," dated December 21, 2012 (the partial award), unanimously finding in favor of Daesang on all of its claims and dismissing all of NutraSweet's defenses and counterclaims. NutraSweet's first counterclaim, asserting that it had validly rescinded the transaction pursuant to section 10 of the JDA, was rejected on the ground that the named plaintiffs in the Aspartame Antitrust class action, regardless of the broad class they purported to represent, did not themselves meet the annual one-million-pound-requirement threshold for triggering the contractual right to rescind. The second and third counterclaims, for rescission based on alleged fraud in Daesang's compliance-with-law warranty and its other [*5]contractual representations and warranties, were rejected on the ground that, based on the tribunal's analysis of the case law cited by the parties, such claims were contractual in nature and could not be pursued on a theory of fraudulent inducement under New York law. As to breach of contract, while the arbitrators recognized that NutraSweet alleged that Daesang had committed numerous breaches of the APA and the Processing Agreement, they concluded that NutraSweet "ha[d] not asserted any alleged breaches of the APA and the Processing Agreement as a claim independent of its claims for rescission of those agreements." In this regard, the tribunal emphasized that section 9(g) of the APA expressly provides that neither party has "the right to rescind, revoke or terminate" the transaction based on any "breach or failure to perform any representation, warranty, covenant or obligation" of the APA or the Processing Agreement. Accordingly, NutraSweet's fourth defense and counterclaim, for breach of contract, was dismissed. The partial award reserved decision on the remedy to be granted to Daesang, which would be determined, after additional submissions by the parties, in a final award.
After the partial award was issued, NutraSweet submitted to the tribunal its "Statement as to the Appropriate Remedy," dated October 3, 2014 (the NS Remedy Statement). In the NS Remedy Statement, NutraSweet took the position that, because the value of the aspartame assets that it had returned to Daesang exceeded Daesang's alleged damages on its claims for breach of contract, "Daesang suffered no damages and is entitled to no recovery." NutraSweet also requested that the partial award in favor of Daesang be reconsidered. In seeking reconsideration, NutraSweet argued, inter alia, that the tribunal had misapplied New York law in dismissing the fraudulent inducement counterclaim based on the compliance-with-law warranty and had been mistaken in concluding that NutraSweet did not seek damages for breach of contract independent of its claims for rescission. In the latter regard, NutraSweet asserted that it had "always . . . asserted stand-alone counterclaims for damages and set-offs based on Daesang's breaches of the APA and the Processing Agreement." In support of the argument concerning the breach of contract counterclaim, NutraSweet pointed to the request for damages on that claim in the NS Post-Hearing Summaries and to its counsel's statement at the closing argument, when asked whether NutraSweet was pursuing fraud claims or breach of contract claims, that " [w]e have both claims, we have a claim for fraud in Section III of the Post-Hearing Summaries and we have a claim for breach of contract in Section IV[.]'"[FN7] The NS Remedy Statement concluded by requesting that the tribunal reconsider the partial award and "award NutraSweet $14,195,685.33 in damages, plus interest, as detailed in [the NS] Post-Hearing Summaries § IV, and as summarized again in the table above."[FN8]
The tribunal issued a final award, dated June 14, 2016, awarding Daesang damages in the total amount of $100,766,258, which included, among other elements, the $64.25 million unpaid balance of the purchase price under the APA and interest through June 10, 2016. The tribunal stood by its dismissal of all of NutraSweet's defenses and counterclaims, including the dismissal of the counterclaim for damages for breach of contract. In response to NutraSweet's position that it had asserted a freestanding claim for damages for breach of contract, the tribunal concluded that, to the extent NutraSweet had asserted any such claim, that claim had been waived in the course of the proceedings. The arbitrators wrote:
"To the extent [NutraSweet] sought to assert a damages claim for breach of contract at an earlier stage in this arbitration, by the time of oral argument following the evidentiary hearing [NutraSweet] chose to pursue a strategy of seeking only rescission and only damages relating to rescission. . . . This meant waiving any independent breach of contract claim. Having submitted [its] case exclusively on a theory of rescission to the Tribunal in response to specific questions from the Tribunal as to the precise remedy being sought and based on an exhibit that only provided for rescissionary damages [NS230-Updated][,] [NutraSweet] cannot now, after the fact and years of arbitration, attempt to change their theory of the case when that theory turns out to have been unsuccessful."
In support of its finding that NutraSweet had waived any freestanding claim for damages for breach of contract, the tribunal cited the following excerpts from the transcript of the October 2011 closing arguments (emphases and ellipses below are as set forth in the final award):
"THE CHAIRMAN: What is [sic] the contract provisions that this claim is based on and what is the basis for the rescission remedy?
"Because as I understand it this claim, like the one we have just talked about, the remedy that is being sought is rescission.
"[NUTRASWEET'S COUNSEL]: The remedy that is being sought under section 3 is equitable rescission, section 3 of NutraSweet's post hearing summaries.
"For some of the same claims NutraSweet also seeks damages under section 4 in the context of its rescission claim NutraSweet is also seeking, for lack of a better term, rescissionary damages or out-of-pocket damages, things which NutraSweet expanded that improved the plant in Gusan . . .
"In the rescission context NutraSweet is asking for a return of the out-of-pocket expenditures to put it back in the place that the parties were had the contract never been made."
* * *
"[TRIBUNAL MEMBER]: But when I went back to reread what is written here irrespective of whether you tied the two together with NS 230 or not you are looking for damages on all of these claims.
"[NUTRASWEET'S COUNSEL]: Rescission including the purchase price payments returned and then the rescissionary damages meaning the money we spent improving Daesang's plant and the other items.
* * *
"Those are not breach of contract damages."
"[TRIBUNAL MEMBER]: I am not asking breach [of] contract or not.
"I am just talking about what you are seeking here."
* * *
"[NUTRASWEET'S COUNSEL]: Rescission including money. Not rescission plus money."
* * *
"[DAESANG'S COUNSEL]: The point is that he is trying to make he is not asking for money damages for the specific act of violating 3Q and 3V [of the APA].[[FN9]]
"Is that a fair statement?
"[NUTRASWEET'S COUNSEL]: That is a fair statement.
"The money that NutraSweet is seeking based on that is based on the rescission to put the parties back in the position they were status quo ante.
"But that is true. There are no contract damages that NutraSweet is seeking for failure to disclose the Coke complaint before the transaction.
"THE CHAIRMAN: Okay. That helps."
The tribunal also based its finding of waiver on NS 230, the damages exhibit, concerning which the arbitrators wrote:
"[NutraSweet] specifically set out the damages that [it was] seeking in [NS 230]. This document lists two categories of damages that were sought as part of [NutraSweet's] rescission counterclaims — Purchase Price Payment' and Breach of Contract/Fraudulent Misrepresentations.' All the damages that [*6]NutraSweet sought in this arbitration fall into one of two legal theories — JDA Rescission' or Equitable Rescission.' [NutraSweet] did not seek damages under any other theory and specifically did not seek any damages outside [its] claims of rescission. Importantly, there is no claim for damages based on an alleged breach of contract."
In September 2016, Daesang commenced this proceeding in Supreme Court, New York County, by filing its petition to confirm the final award pursuant to article 75 of the CPLR and the FAA. NutraSweet answered and cross-moved to vacate both the partial award and the final award "on the grounds that the arbitrators manifestly disregarded the law and evidence, violated public policy, and utterly failed to discharge their duties in accordance with the law and the Terms of Reference governing the arbitration[.]"
After hearing argument in December 2016, Supreme Court issued an order, entered May 15, 2017, granting NutraSweet's motion to vacate the awards to the extent of vacating the dismissals of the second and third counterclaims seeking equitable rescission based on fraudulent inducement and of the fourth counterclaim for breach of contract, and remanding the matter to the arbitration tribunal for a "redetermination" of those claims. Daesang's petition for confirmation was held in abeyance pending the tribunal's redetermination of the remanded claims.
In its decision, Supreme Court recognized that the enforceability of the partial award and final award is governed by the FAA, that judicial review of an arbitration award under the FAA (as under New York law) is extremely limited, and that the doctrine of manifest disregard of the law does not authorize a court to vacate an arbitration award based simply on the arbitrators' arguable error or misunderstanding of the applicable law. Applying these principles, the court concluded that it could not vacate the tribunal's dismissal of NutraSweet's counterclaim for rescission under section 10 of the JDA [FN10]. The court reached a different conclusion, however, with regard to the dismissal of the counterclaims for equitable rescission and for breach of contract.
Concerning the counterclaims for equitable rescission, the court found that "the Tribunal chose to disregard the well-established principle [invoked by NutraSweet during the arbitration] that a fraud claim can be based on a breach of contractual warranties where the misrepresentations are of present facts (in contrast to future performance) and cause the actual losses claimed." As to the counterclaim for breach of contract, the court found that "a careful reading of the transcript utterly fails to demonstrate that there was a waiver by Nutra[S]weet of its breach of contract counterclaim at the October 20, 2011 [closing argument] hearing." The court opined that "[t]he portion of the transcript relied upon by the Tribunal was a dialogue concerning counterclaim III, re[s]cission, not [counterclaim] IV, breach of contract. Thus, there was no basis to conclude that there was a waiver by NutraSweet." Therefore, the court [*7]concluded, "The refusal to consider the merits of NutraSweet's breach of contract counterclaim and the baseless determination of waiver goes beyond mere error in law or facts, and amounts to an egregious dereliction of duty on the part of the Tribunal" (citing Wien & Malkin, 6 NY3d at 480-481). The court did not reach NutraSweet's argument that enforcement of the awards would be contrary to public policy. This appeal by Daesang ensued.
The parties agree that the enforcement of the arbitration awards rendered in this international commercial dispute is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (21 UST 2517, reprinted following 9 USCA § 201) (the Convention) and by the FAA (see Yusuf Ahmed Alghanim & Sons, W.L.L. v Toys "R" Us, Inc., 126 F3d 15, 18-19 [2d Cir 1997], cert denied 522 US 1111 [1998]). Because the awards were rendered in the United States, the FAA governs (pursuant to the Convention, art V, § 1[e], and 9 USC § 208) whether the awards may be set aside or vacated in this proceeding brought within the United States (Yusuf Ahmed Alghanim & Sons, 126 F3d at 20-23). The Convention and the FAA mandate, however, that a court "shall confirm [an arbitral] award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention" (9 USC § 207; Convention, art V, §§ 1, 2).
The Court of Appeals has offered the following guidance concerning the enforcement of arbitration awards under the FAA:
"It is well settled that judicial review of arbitration awards is extremely limited. An arbitration award must be upheld when the arbitrator offers even a barely colorable justification for the outcome reached. Indeed, we have stated time and again that an arbitrator's award should not be vacated for errors of law and fact committed by the arbitrator and the courts should not assume the role of overseers to mold the award to conform to their sense of justice" (Wien & Malkin, 6 NY3d at 479-480 [citations, brackets and internal quotation marks omitted]).
The FAA expressly provides four grounds on which a court, upon application by a party, may vacate an arbitration award (9 USC § 10[a]). Of these four express statutory grounds for vacatur, only one is invoked by NutraSweet here — a situation "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made" (9 USC § 10[a][4]). In addition, NutraSweet argues that the subject awards are subject to vacatur on the implied ground of manifest disregard of the law (see Wilko v Swan, 346 US 427, 436-437 [1953]), of which the Court of Appeals has written:
"[A]n award may be vacated under federal law if it exhibits a manifest disregard of the law' (Duferco Intl. Steel Trading v T. Klaveness Shipping A/S, 333 F3d 383, 388 [2d Cir 2003]; Goldman v Architectural Iron Co., 306 F3d 1214, 1216 [2d Cir 2002], citing DiRussa v Dean Witter Reynolds Inc., 121 F3d 818, 821 [2d Cir 1997]). But manifest disregard of the law is a severely limited' doctrine (Matter of Arbitration No. AAA13-161-0511-85 Under Grain Arbitration Rules, 867 F2d 130, 133 [2d Cir 1989]). It is a doctrine of last resort limited to the rare occurrences of apparent egregious impropriety' on the part of the arbitrators, where none of the provisions of the FAA apply' (Duferco, 333 F3d at 389). The doctrine of manifest disregard, therefore, gives extreme deference to arbitrators' (DiRussa, 121 F3d at 821). The Second Circuit has also indicated that the doctrine requires more than a simple error in law or a failure by the arbitrators to understand or apply it; and, it is more than an erroneous interpretation of the law" (Duferco, 333 F3d at 389). We agree with that premise. To modify or vacate an award on the ground of manifest disregard of the law, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or [*8]ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case' (Wallace v Buttar, 378 F3d 182, 189 [2d Cir 2004], quoting Banco de Seguros del Estado v Mutual Mar. Off., Inc., 344 F3d 255, 263 [2d Cir 2003])" (Wien & Malkin, 6 NY3d at 480-481 [footnotes omitted]).[FN11]
We turn first to the arbitrators' dismissal of NutraSweet's second and third counterclaims for equitable rescission of the transaction based on fraud in the inducement. As previously noted, Supreme Court set aside this determination, and remanded the two equitable rescission counterclaims to the arbitrators for redetermination, on the ground that the tribunal had manifestly disregarded the law in holding that these claims, based on allegedly false representations made by Daesang in the APA and the Processing Agreement, were contractual in nature and therefore could not be pursued by NutraSweet on a theory of fraud. In so doing, Supreme Court plainly erred. At most, the tribunal "state[d] an intention to apply a law, and then misapplie[d] it," which constitutes nothing more than a mere error of law for which "[an] award will not be set aside" (Matter of Sprinzen [Nomberg], 46 NY2d 623, 629 [1979]).
To recapitulate, NutraSweet, in its second and third counterclaims, alleges that Daesang's compliance-with-law warranty in the APA, and several other representations and warranties concerning Daesang's aspartame business in the APA and the Processing Agreement, were materially false when made. Before the arbitrators, NutraSweet contended that, because these allegedly false contractual representations fraudulently induced it to enter into the transaction, it was entitled to rescission of the entire transaction on equitable grounds [FN12]. The parties disputed, among other issues relating to these counterclaims, whether claims that contractual representations had been false when made could be pursued on a fraud theory (as opposed to a theory of breach of contract) under New York law.
In debating whether the second and third counterclaims could be maintained on a theory of fraud, each side relied on an opposing line of decisional authority. One of the cases on which NutraSweet placed primary reliance was Merrill Lynch & Co. Inc. v Allegheny Energy, Inc. (500 F3d 171 [2d Cir 2007]). In dismissing the equitable rescission counterclaims in the partial award, the arbitrators quoted and applied (whether correctly or incorrectly) the following standard set forth in Merrill Lynch for resolving the issue presented:
"[U]nder New York law, parallel fraud and contract claims may be brought if the plaintiff (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages" (id. at 183).
The tribunal went on to discuss the facts of Merrill Lynch, observing that the fraud claim in that case was allowed to proceed because it was
"based on misrepresentations regarding the financial statements delivered to Allegheny before the parties entered into their contract. This involved a legal duty separate from the duty to perform under the contract and also involved a misrepresentation that was collateral or extraneous to the contract. Thus, the misrepresentations with respect to the financial statements could give rise to a claim for fraud wholly apart from any claim for breach of contract" (citation and internal quotation marks omitted).
The tribunal concluded that Merrill Lynch was distinguishable from the instant matter because NutraSweet
"rel[ies] only on the language of the representations in the APA to support [its] claim of fraud in the inducement. However, the contract provision does not create a legal duty separate from the contract; it is not a provision collateral or extraneous to the contract. . . . Thus, [NutraSweet's] reliance on the Merrill Lynch decision is misplaced."
The tribunal further opined that "[t]he facts of this case are much more similar to the cases relied on by Daesang," citing, inter alia, Dyncorp v GTE Corp. (215 F Supp 2d 308, 324 [SD NY 2007] [dismissing "fraud claims based on the breach of contractual warranties and representations . . . as duplicative of (the party's) claim for breach of contract"]).
The foregoing suffices to show that the resolution in the partial award of the issue of the viability of NutraSweet's fraud counterclaims — whether or not that resolution was correct (a question on which we express no opinion) — does not meet the high standard required to establish manifest disregard of the law, namely, a showing that "the arbitrator[s] knew of the relevant principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it" (Westerbeke Corp. v Daihatsu Motor Co., 304 F3d 200, 217 [2d Cir 2002]). On the contrary, the tribunal accepted the authority of the decision on which NutraSweet primarily relied (Merrill Lynch) and, "after analyzing [the] case law offered by both sides" (Cheng v Oxford Health Plans, Inc., 45 AD3d 356, 357 [1st Dept 2007]), made a good-faith effort to apply to the facts of this case the Merrill Lynch standard proffered by NutraSweet. That the arbitrators did not accept NutraSweet's view of how the relevant legal principle applies to the facts of this case does not amount to "refus[ing] to apply [the principle] or ignor[ing] it altogether" (Wien & Malkin, 6 NY3d at 481 [internal quotation marks omitted]). The arbitrators' ruling, whether or not we agree with it on the merits, more than meets the requirement that there be at least "a barely colorable justification for the outcome reached" (id. at 479 [internal quotation marks omitted]). Even if a thorough analysis of the underlying legal issue (which we do not propose to undertake here) would lead us to conclude that NutraSweet was correct on the merits, a finding of manifest disregard of the law "requires more than a simple error in law or a failure by the arbitrators to understand or apply it" (id. at 481 [internal quotation marks omitted]). On this record, NutraSweet can show nothing more than this.
Moreover, it cannot be said that the point of law at issue was sufficiently "well defined" (id. [internal quotation marks omitted]) to give rise to a claim that the award was rendered in manifest disregard of the law. The meaning of the rule that an alleged misrepresentation is actionable as fraud if it is "collateral or extraneous to the contract" (Merrill Lynch, 500 F3d at 183) — which NutraSweet unsuccessfully argued to the tribunal that its second and third counterclaims satisfied — is not necessarily transparent from the quoted words alone and must be drawn out through detailed analysis of cases in which the rule has been applied. Even if the arbitrators erred in concluding that NutraSweet's fraud claims were not "collateral or extraneous" to the contractual representations in the APA and the Processing Agreement, the arbitrators did not manifestly disregard the law by according to the quoted decisional language what may have reasonably seemed to them its natural meaning. Certainly, any error by the arbitrators in deciding this issue (and, again, we make no determination as to whether they in fact erred) was far from "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator" (Merrill Lynch, Pierce, Fenner & Smith, Inc. v Bobker, 808 F2d 930, 933-934 [2d Cir 1986]), which is the standard for a showing of manifest disregard of the law.[FN13]
In its appellate brief, NutraSweet appears to defend the vacatur of the dismissal of its second counterclaim (based on the alleged falsity of the compliance-with-law warranty) on the ground that "Daesang's admissions of criminal wrongdoing [in the aforementioned affidavit of its executive, Dae Yeob Park] should have been of critical importance to the arbitrators' deliberations[.]" Any such argument, to the effect that the tribunal did not give sufficient weight to a part of the evidentiary record before it, is entirely without merit. "Manifest disregard of the facts is not a permissible ground for vacatur of an award" (Wien & Malkin, 6 NY3d at 483; see also United Paperworkers Intl. Union, AFL-CIO v Misco, Inc., 484 US 29, 39 [1987] ["improvident, even silly, factfinding" does not afford "a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts"]); Matter of Dowleyne v New York City Tr. Auth., 3 NY3d 633, 634 [2004] [reversing vacatur of an award "because (the [*9]court) improperly substituted its factual finding for that of a majority of the arbitration panel"]).[FN14]
This brings us to NutraSweet's fourth counterclaim, for breach of contract, the dismissal of which by the arbitrators — first (in the partial award) on the ground that NutraSweet had not asserted any claim for breach of contract independent of its dismissed rescission claims, then (in the final award) on the ground that NutraSweet had waived any freestanding claim to recover damages for breach of contract — was vacated by Supreme Court as "an egregious dereliction of duty on the part of the Tribunal." On appeal, Daesang argues that there were no grounds for this judicial action under the FAA because the court failed to identify any "well defined and clearly applicable" point of law that the arbitrators had disregarded, and because the arbitrators' factual findings and procedural rulings were beyond the court's review. We agree.
In opposing Daesang's appeal, NutraSweet chiefly argues that Supreme Court's reinstatement of its breach of contract counterclaim was warranted by the provision of the FAA authorizing vacatur of an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made" (9 USC § 10[a][4])[FN15]. NutraSweet contends that its breach of contract counterclaim was submitted to the arbitrator as a freestanding claim for monetary damages (independent of the counterclaims for rescission) and — contrary to the arbitrators' ultimate determination — was never waived or withdrawn. Therefore, NutraSweet argues, the tribunal's dismissal of the breach of contract counterclaim without addressing its merits rendered the final award such an "imperfect[] execut[ion]" of the arbitrators' powers that the final award was not "a mutual, final and definite award upon the subject matter submitted[.]"
Contrary to NutraSweet's arguments, that an arbitral tribunal disposed of a claim or defense on procedural grounds, without reaching its merits — even if such a disposition would have constituted error reversible on appeal in a judicial proceeding — does not mean that the arbitral tribunal exceeded or imperfectly executed its powers, nor does it mean that the resulting award falls short of being a mutual, final, and definite award upon that claim or defense (see AmeriCredit Fin. Servs., Inc. v Oxford Mgt. Servs., 627 F Supp 2d 85, 96 [ED NY 2008] ["Regardless of whether the arbitrator dismissed defendant's counterclaim on the merits or as a procedural matter, that decision is within his broad grant of authority under the (arbitration agreement)"]). While, as previously noted, this matter is governed by the FAA, we observe that similar conclusions have been reached by courts applying the analogue of 9 USC § 10(a)(4) in CPLR article 75, which authorizes vacatur where an arbitrator "exceeded his [or her] power or so [*10]imperfectly executed it that a final and definite award upon the subject matter submitted was not made" (CPLR 7511[b][iii]). "An award is deficient . . . only if it leaves the parties unable to determine their rights and obligations, if it does not resolve the controversy submitted or if it creates a new controversy" (Matter of Meisels v Uhr, 79 NY2d 526, 536 [1992]; see also Yoonessi v Givens, 78 AD3d 1622, 1623 [4th Dept 2010], lv denied 17 NY3d 718 [2011] ["the arbitration award was final and definite . . . even if (the arbitrators) failed to consider an award for economic loss or loss of consortium"]; Matter of Wabst v Scoppetta, 56 AD3d 399, 399 [1st Dept 2008] ["The arbitrator's refusal to address petitioner's state law defenses to charges 9 and 10, based on his mistaken belief that he lacked jurisdiction, does not deprive the award of finality and definiteness"]).
Moreover, Supreme Court's determination, based on its own "careful reading of the transcript," that the tribunal had misinterpreted the procedural history of the arbitration in finding that NutraSweet had waived its breach of contract counterclaim, was misplaced in a proceeding brought to confirm an arbitration award under the FAA. Even if a "careful reading of the transcript" would lead us to agree that the tribunal's finding of waiver in the final award was based on a misunderstanding of NutraSweet's oral arguments and written submissions, it would not affect the outcome of this appeal. A court is not empowered by the FAA to review the arbitrators' procedural findings, any more than it is empowered to review the arbitrators' determinations of law or fact. "[W]hen the subject matter of a dispute is arbitrable, procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator" (United Paperworkers, 484 US at 40; cf. Howsam v Dean Witter Reynolds, Inc., 537 US 79, 84 [2002] [noting that "the presumption is that the arbitrator should decide allegations of waiver" when asserted as a defense to arbitration] [internal quotation marks and brackets omitted]).
Given that parties agreeing to arbitrate their disputes entrust the determination of procedural issues arising out of the arbitration — no less than issues of law and of fact — to the arbitrators, the arbitrators' reading of the procedural record before them should be judged by the same highly deferential standard that is applied to their construction of the parties' agreements. Thus, "an arbitral decision even arguably construing or applying the [procedural record] must stand, regardless of a court's view of its (de)merits" (Oxford Health Plans, 569 US at 569 [internal quotation marks omitted]). "So the sole question for us is whether the arbitrator[s] (even arguably) interpreted the [procedural record], not whether [they] got its meaning right or wrong" (id.). If it were otherwise, "arbitration would become merely a prelude to a more cumbersome and time-consuming judicial review process" (id. at 568-569 [internal quotation marks omitted]). As with issues of contractual interpretation, "plenary review by a court of the [procedural record] would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final" (United Steelworkers of Am. v Enterprise Wheel & Car Corp., 363 US 593, 599 [1960]).[FN16]
As in Oxford Health Plans, "we have already all but answered th[e] question [of whether the arbitrators were even arguably interpreting the procedural record] by summarizing" their [*11]reasoning (569 US at 570) in finding, in the final award, that the breach of contract counterclaim had been waived, insofar as it sought a monetary recovery independent of the remedy of rescission, at the time of closing oral arguments, if not before. That reasoning, as noted, was based primarily on an analysis of NutraSweet's oral closing argument and NS 230, the damages exhibit NutraSweet submitted before closing arguments. It is possible that, as NutraSweet contends, the arbitrators misunderstood the portions of NutraSweet's closing oral argument quoted in the final award [FN17]. It is also possible that the arbitrators misread NS 230, which sets forth damages calculations to accompany contractual rescission (first counterclaim) and equitable rescission (second and third counterclaims), respectively, but does not indicate which calculation applies to the fourth counterclaim, for breach of contract, or whether the latter counterclaim is being pursued independently of the rescission claims at all. However, whether or not the arbitrators' finding of waiver was based on a misconstruction of NutraSweet's oral arguments and written submissions is a question
"not properly addressed to a court. . . . All we say is that convincing a court of an . . . error [by the arbitrators] — even [their] grave error — is not enough. So long as the arbitrator[s] [were] arguably construing the [procedural record] — which this [tribunal] was — a court may not correct [their] mistakes under § 10(a)(4). The potential for those mistakes is the price of agreeing to arbitration. . . . The arbitrator[s'] construction holds, however good, bad, or ugly" (id. at 572-573 [internal quotation marks and citations omitted]).
Stated otherwise, because the arbitrators gave at least "a barely colorable justification for the outcome reached" (Wien & Malkin, 6 NY3d at 479 [internal quotation marks omitted]), their finding of waiver must stand.[FN18]
Finally, NutraSweet argues, in the alternative, that the order appealed from should be affirmed on the independent ground — not reached by Supreme Court — that the enforcement of the partial and final awards would be contrary to the public policy of the United States. While the Convention permits a court of a signatory country to deny an arbitral award enforcement if such enforcement "would be contrary to the public policy of that country" (Convention, art V, § 2[b]), we see no conflict between enforcement of the partial and final awards and national public policy. NutraSweet does not contend that the contracts enforced against it by the awards — the APA and the Processing Agreement — were themselves unlawful. Rather, NutraSweet argues it was fraudulently induced by Daesang's allegedly false compliance-with-law warranty (concerning its prior conduct) to enter into those agreements and, therefore, enforcing the award of damages to Daesang for NutraSweet's breach of the agreements would (in NutraSweet's view) permit a wrongdoer to profit from its own wrongdoing. However, the arbitral tribunal made no finding that NutraSweet was, in fact, fraudulently induced to enter into the transactions with Daesang [FN19]. Thus, there is nothing on the face of the partial and final awards to indicate that they violate public policy and, hence, no basis to deny those awards enforcement on public policy grounds (see Matter of Metrobuild Assoc., Inc. v Nahoum, 51 AD3d 555, 557 [1st Dept 2008], lv denied 11 NY3d 704 [2008]). We have no hesitation in reaching this conclusion, given that — "in light of the overriding purpose of the Convention . . . to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries" (Waterside Ocean Nav. Co. v International Nav. Ltd., 737 F2d 150, 152 [2d Cir 1984] [internal quotation marks omitted], quoting Scherk, 417 US at 520 n 15) — the Convention's public policy defense to enforcement of an award "should be construed narrowly" and "should apply only where enforcement would violate our most basic notions of morality and justice" (Waterside, 737 F2d at 152 [internal quotation marks omitted]).
Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered May 15, 2017, which, to the extent appealed from as limited by the briefs, held in abeyance the petition to confirm a final arbitration award, dated June 14, 2016, rendered in favor of petitioner by a tribunal of the International Chamber of Commerce, and granted respondents' cross motion to vacate the aforementioned final award and the preceding final partial award, dated December 21, 2012, rendered by the same tribunal, to the extent of vacating the awards' dismissal of
respondents' second, third and fourth defenses and counterclaims and remanding those defenses and counterclaims to the tribunal for redetermination, should be reversed, on the law, with costs, the petition granted, and the cross motion denied. The Clerk is directed to enter judgment accordingly.
All concur.
Order, Supreme Court, New York County (Charles E. Ramos, J.), entered May 15, 2017, [*12]reversed, on the law, with costs, the petition granted, and the cross motion denied. The Clerk is directed to enter judgment accordingly.
Opinion by Friedman, J.P. All concur.
Friedman, J.P., Andrias, Singh, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: SEPTEMBER 27, 2018
CLERK



Footnotes

Footnote 1:The United States Supreme Court has observed that "[a] contractual provision specifying in advance the forum in which disputes shall be litigated . . . is . . . an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction. Furthermore, such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved. A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages" (Scherk v Alberto-Culver Co., 417 US 506, 516-517 [1974] [footnote and paragraph break omitted]). While the decision under review cannot fairly be characterized as "parochial," we are cognizant, in deciding this appeal, of the following caution issued by The Association of the Bar of the City of New York in the amicus curiae brief it has submitted in support of this appeal: "Any suggestion that New York courts will review the arbitrators' factual and legal determinations, as if on appeal, . . . will discourage parties from choosing New York as the place of arbitration."

Footnote 2:Daesang is incorporated and headquartered in the Republic of Korea. The NutraSweet Company, which is incorporated in Delaware and headquartered in Illinois, is the parent of the two other respondents, NutraSweet IP Holdings, Inc. and Sweeteners Holdings Korea Ltd. This opinion refers to the three respondents collectively as NutraSweet.

Footnote 3:Daesang granted NutraSweet a four-month extension of the due date for the second installment payment but denied NutraSweet's request for an additional extension thereafter.

Footnote 4:NutraSweet's claim of the falsity of Daesang's compliance-with-law warranty is principally based on an affidavit by Dae Yeob Park, a Daesang executive, that was submitted in the Aspartame Antitrust case. In this affidavit, Park admits that Daesang had committed certain antitrust violations in running its aspartame business before the sale to NutraSweet. As Daesang points out, however, Park alleges in his affidavit that NutraSweet itself — a much larger aspartame producer than Daesang — participated in the anticompetitive activities he describes.

Footnote 5:Although NS 230 calculates the damages to be awarded in the event the panel validated NutraSweet's rescission of the transaction pursuant to the JDA, the summary of the JDA rescission claim in the NS Post-Hearing Summaries does not mention any damages sought in connection with this claim. This unexplained discrepancy does not affect the disposition of this appeal.

Footnote 6:Confusingly, the same page of the NS Post-Hearing Summaries states that "NutraSweet is entitled to a monetary award of $14,195,685.33" based on Daesang's alleged breaches. The discrepancy corresponds to a set-off of $337,903 that was applied in NS 230 in reaching the lesser damages figure ($13,857,782.33) on the claim for rescission under the JDA. We note that the counterclaims for fraud-based rescission sought a greater amount of damages ($20,691,915.99) because those claims sought a recovery that included the refund of the portion of the purchase price that NutraSweet had paid, less the amount of those payments that had been allocated to inventory. Under the JDA, Daesang was entitled to keep any portion of the purchase price that had been paid before a rescission pursuant to Section 10 of that agreement went into effect.

Footnote 7:The conclusion of counsel's quoted sentence, for which the NS Remedy Statement substituted an ellipsis, was: ". . . and I am just dealing with them together here to make it quicker."

Footnote 8:This statement refers to a damages table set forth earlier in the NS Remedy Statement, in which NutraSweet calculated its damages for breach of contract (with interest through August 1, 2011) as $14,195,685.33, again, without explaining the failure to apply the $337,903 set-off that had been used in calculating damages on its other claims. To the $14,195,685.33 figure, the NS Remedy Statement's table added $2,734,012.27 for interest from August 2, 2011 through October 31, 2014, and a further recovery of $3,224,669. The latter figure — which NutraSweet apparently requested for the first time in the NS Remedy Statement, submitted after the arbitrator's initial decision — represented "restitution" of the amount by which the alleged value of the returned aspartame assets exceeded the damages claimed by Daesang. Thus, the total recovery NutraSweet sought in the NS Remedy Statement was $20,154,366.60.

Footnote 9:Sections 3(q) and 3(v) of the APA are Daesang's representations concerning the absence of prior customer complaints.

Footnote 10:The court found that the dismissal of the counterclaim for rescission under the JDA had to be upheld under the FAA even though the court disagreed with the arbitrators' view that the aspartame requirements solely of the named plaintiffs in the Aspartame Antitrust class action could be considered in determining whether the contractual right to rescind had been triggered. Because NutraSweet, the only party aggrieved by this aspect of the decision, has not taken an appeal, we need not further consider the claim for rescission under the JDA.

Footnote 11:Since Wien & Malkin was decided, the Second Circuit has clarified, in light of Hall St. Assoc., L.L.C. v Mattel, Inc. (552 US 576 [2008]), that it regards the doctrine of manifest disregard of the law as "a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA," rather than as "a ground for vacatur entirely separate from those enumerated in the FAA" (Stolt-Nielsen SA v AnimalFeeds Intl. Corp., 548 F3d 85, 94 [2d Cir 2008], revd on other grounds 559 US 662 [2010]).

Footnote 12:Again, Supreme Court upheld the arbitrator's dismissal of NutraSweet's first counterclaim, for contractual rescission pursuant to section 10 of the JDA, and that claim is not at issue on this appeal. It should also be borne in mind that NutraSweet could not seek rescission on a breach-of-contract theory because, as previously noted, the APA bars rescission as a remedy for breach of a representation or warranty.

Footnote 13:The difficulty of applying the legal rule in question is highlighted by the fact that there were dissents from two of the decisions of this Court cited by Supreme Court (in the decision appealed from) and by NutraSweet (on this appeal) in support of the position that the arbitrators manifestly disregarded the law (see Wyle Inc. v ITT Corp., 130 AD3d 438, 442-450 [1st Dept 2015] [Moskowitz, J., dissenting]); GoSmile, Inc. v Levine, 81 AD3d 77, 83-84 [1st Dept 2010], lv dismissed 17 NY3d 782 [2011] [Nardelli, J., dissenting in part]). Wyle, which was decided after the issuance of the partial award, is in any event irrelevant to determining whether the tribunal manifestly disregarded the law because that decision was never brought to the attention of the tribunal. We note that, contrary to a statement in the decision appealed from, nowhere in either the partial award or the final award did the arbitrators "mischaracterize[] NutraSweet's fraudulent inducement counterclaim and defense as one in which NutraSweet merely alleged that Daesang made an insincere promise of future performance."

Footnote 14:We note that, although the tribunal did not base its dismissal of the second counterclaim on findings of fact, it may well have concluded that, if it were to credit Park's admission in his affidavit that Daesang had participated in an anticompetitive conspiracy, it should also credit Park's allegations in the same affidavit that NutraSweet had been involved in the same conspiracy — which, if true, would negate NutraSweet's claim of reliance on Daesang's compliance-with-law warranty.

Footnote 15:NutraSweet does not identify any point of law that was known to the arbitrators but disregarded by them in dismissing the breach of contract counterclaim. We therefore conclude that the vacatur of this aspect of the partial and final awards cannot be affirmed as a proper application of the doctrine of manifest disregard of the law.

Footnote 16:That the eight-year-long arbitration in this complex international business dispute was itself unavoidably "cumbersome and time-consuming" does not modify the FAA's mandate to steer clear of full-blown judicial review of the arbitrators' legal, factual and procedural findings. However protracted the arbitration proceedings were, following them up with judicial review would only further delay the matter's final resolution.

Footnote 17:Such a misunderstanding conceivably might have arisen from NutraSweet's choice, for purposes of saving time, to address simultaneously its damages arguments under the third and fourth counterclaims, and in so doing, to refer repeatedly to its claims for "rescissionary" damages. In this regard, the arbitrators highlighted in the final award NutraSweet's statement in its closing argument that it sought, without qualification, "[r]escission including money. Not rescission plus money." We note that NutraSweet does not identify any point during the arbitration at which it expressly clarified to the tribunal, either orally or in writing, that, in the event all of its claims for rescission were rejected, it sought monetary damages for breach of contract as an alternative, stand-alone remedy.

Footnote 18:To the extent NutraSweet argues that the final award is internally inconsistent in dismissing the fraud-based claims for rescission as duplicative of claims for breach of contract, while at the same time finding that any freestanding claim to recover damages for breach of contract had been waived, such an argument is unavailing. "[I]nternal inconsistencies within an arbitral judgment are not grounds for vacatur" (Westerbeke, 304 F3d at 211). This is so even if the court finds that the claim of internal inconsistency is "plausible" (Saint Mary Home, Inc. v Service Empls. Intl. Union, Dist. 1199, 116 F3d 41, 45 [2d Cir 1997]).

Footnote 19:As previously noted, assuming the truth of the Park affidavit on which NutraSweet bases its claim that the compliance-with-law warranty was false, there is substantial reason to doubt that NutraSweet actually placed any reliance on that warranty.